## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO.  CR-12-0076-HE |
| | ) | |
| BRIAN HEATH COLLINS (01); | ) | |
| ROGER RYAN PARKER (02); and | ) | |
| JAMES DERAY SMITH (03), | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Defendants James Deray Smith, Robert Ryan Parker and Brian Heath Collins are charged in a two count indictment with manufacturing methamphetamine and possessing methamphetamine with the intent to distribute it in violation of 21 U.S.C. §841(a)(1). Defendants have each filed a motion to suppress, seeking to suppress all evidence, including physical evidence, oral statements and cell phone messages, obtained as a result of the search of defendant Smith's property and the stops of Parker and Collins' vehicles.

A hearing was held on May 21, 2012, at which Tim King, the undersheriff of Cotton County, defendant Parker and a private investigator testified. Having considered the evidence, arguments of counsel and the parties' briefs, the court concludes defendants' motions to suppress should be denied.

### Background

Around 9:45 p.m. on January 31, 2012, Kenny Bshawn, who lived just south of Highway 70 in Cotton County near defendant Smith's property, called the county sheriff and

reported a strong chemical odor.  Bshawn apparently did not identify the source of the odor, but indicated he could smell it from his residence.

Smith's property was located at the intersection of  U.S. Highway 70 and County Road 2710.[1]  The address was Rural Route 1, Box 13, Hastings, Oklahoma.   It consisted of a house and outbuildings that were approximately 20-30 yards from the highway.  Bshawn's property was to the southwest of Smith's property.  Another residence was located directly to the east of Smith's property.   There were properties in all directions from Smith's residence, each a quarter of a mile away or a little less.   The residence is in a rural, farming area, surrounded by cultivated fields.

The sheriff contacted Undersheriff Tim King and David Johnson, another deputy. Deputy Johnson drove by Smith's residence and then called and told Undersheriff King that a strong chemical odor was coming from the shop on Smith's property.[2]  Undersheriff King then drove there.  He was familiar with the location because of prior narcotics transactions that had occurred on the premises.  He also was aware that both Smith and Parker had prior methamphetamine convictions.

Undersheriff King passed the Smith residence while driving on Highway 70 and then turned around and drove by again.  Both times he caught the odor of a chemical mixture used in the manufacture of  methamphetamine.  The odor appeared to be coming from the farthest

---

[1]*There was an unofficial road sign, Pecan Grove, at the intersection next to the Smith residence.*

[2]*The officers also referred to this building as a barn or shed.*

outbuilding.  The wind that evening was blowing from the north to the south, towards the highway from the Smith property.  King was completely confident that the odor was from a methamphetamine laboratory.  The officer had prior experience with methamphetamine laboratories, having been involved in the search and seizure of a number of them over the years.  He also had received training regarding methamphetamine laboratories.  He had attended clandestine laboratory schools run by both the Drug Enforcement Agency ("DEA") and the Oklahoma Bureau of Narcotics ("OBN").

In addition to detecting the chemical odor when he drove by the Smith residence, Undersheriff King noticed that a white van was parked in the driveway.  He recognized the van as belonging to defendant Parker.  A couple of months earlier he had stopped Parker when he was driving the van.  He knew that Parker's sister, Robin, lived with Smith at Smith's residence and that Parker was a common visitor there.[3]  Undersheriff King had seen the van parked there possibly two to three times a week and overnight.  He also observed a dark pickup parked near one of the outbuildings.

After passing the house twice, Undersheriff King pulled into a residence to the west of Smith's property and had one deputy go south of the property and another north.  At approximately 10:45 p.m. he contacted Deputy Davis with the Cotton County Sheriff's Department and had her begin the process of obtaining a search warrant.  He believed he had probable cause to search, but was not concerned about an explosion, particularly after the

---

[3]*Smith and Parker's sister had lived at the residence for approximately four to five years.*

lights went off at the barn.  The officers watched the residence for an hour and a half to two hours to make sure no one left the premises while the search warrant was being sought.  Just before midnight both the van and pickup left the property.  Undersheriff King followed and stopped the van, which was headed east on Highway 70. He testified that he stopped the vehicle because he assumed, based on the odor coming from the property, that it contained either finished product or a methamphetamine lab.  For the same reason he had two deputies stop and detain the pickup, which was headed west and was driven by defendant Collins. Collins' pickup was searched with his consent and nothing was found.

Undersheriff King approached Parker's van and visited with him and his female passenger.  He had them exit the vehicle and advised Parker that he knew they had been "cooking dope" at the residence.  He testified that Parker "kind of ducked his head and shook his head yes."  Parker consented to a search of the van.  As Undersheriff King started the search he passed Parker and could smell the chemical odor on his person.  Undersheriff King then told another deputy to stay with Parker and the van and he returned to the residence.

When King reached the residence Deputy Davis called and said the warrant had been issued.  Undersheriff King went to the house and Smith came to the door.  King explained the situation and said he knew what they were doing in the barn and told Smith to get dressed.  He left a deputy with Smith and went to the barn.  It was locked so he returned to the residence.  He told Smith that he wanted him and Robin to accompany two of the deputies as they searched the residence and removed everything that was illegal. Undersheriff King then returned to the barn with the keys and began to search it.  Shortly

4

thereafter Deputy Davis drove up with the search warrant.  The deputies immediately brought Smith to the barn where Undersheriff King showed him the warrant.

During the search of the barn Undersheriff King found several boxes of methamphetamine trash, an active generator and a drying table with pink residue on it.[4]  He opened an ice box and found a complete meth lab inside it.  He also found an anhydrous tank, a fire pit and a substance which was later confirmed to be methamphetamine.

Deputy Davis had executed the affidavit that was used to obtain the search warrant.  In her affidavit she describes the residence as being "located at RR.1 Box 18, Hastings,[5] Cotton County, Oklahoma," and included the following directions to the home: "To arrive at said residence beginning at the intersection of Lone Star Road and State Highway 70, in Hastings, Cotton County, Oklahoma, go approximately 1 mile east on Highway 70, and you will arrive at the entrance to the residence located on the north side of the road."  Defendant's Hearing Exhibit 2, Search Warrant, Attachment "A."  The property is described as: "a single story white wood frame structure with a White metal roof.  The residence runs length wise north and south.  The front door faces the west.  On the south side of the residence is an entrance into the residence.  Also on the property are two outbuildings, several vehicles and farming equipment and trailers."  *Id.*  The address was incorrect in that it listed the wrong

---

[4]*The officers started searching the house and the barn approximately five to ten minutes before Deputy Davis arrived with the warrant.*

[5]*Although the address refers to Hastings, the residence is actually six to eight miles from the town.  The city's name is included in the address to identify the post office to which mail for that residence is sent.  Individuals with a Hastings rural route address get their mail from the Hastings post office.*

box number.  Rural Route 1, Box 18 is actually a mile south of the Smith residence.  The affidavit also incorrectly referred to Highway 70 as a state highway when it is a federal highway.  The search warrant return correctly reflects that the property associated with Box 13 (Smith's residence) was searched.

> In the supporting affidavit, Deputy Davis attested that:
>
> On the 31st day of January, 2012, at approximately 2245 hours, Undersheriff Tim King telephoned and advised your Affiant that he and Deputy David Johnston drove by described residence in Attachment A, and detected an very strong odor of Anhydrous Ammonia and Ether.  Due to Undersheriff King's training experience with methamphetamines lab, David Johnston, Deputy Milton Honeycutt, Deputy Shannon Barker and Undersheriff King remained in a pyramid setting of the residence until Search Warrant was obtained.

*Id*. at Attachment "B."

A Cotton County district judge signed the warrant, which recites that there was probable cause to believe that a controlled dangerous substance was being manufactured, and methamphetamine was being possessed, on the premises.  Undersheriff King and other Cotton County deputies executed the warrant during the early morning hours of February 1, 2012.

**<u>Defendant Smith's Motion</u>**

Defendant Smith argues that the search warrant affidavit failed to establish probable cause because it did not describe the undersheriff's training and experience with methamphetamine labs, failed to state that the odor detected was coming from the residence or its outbuildings, rather than some other source, such as a fertilized field, and failed to link the detected odor to illegal activity.  He contends the information included in the affidavit

was stale because the affidavit did not specify the date and time the odor was allegedly

detected.[6]  He contends the executing officers cannot rely on the good faith exception to the

exclusionary rule as the warrant is so facially deficient that the officers could not reasonably

presume it to be valid.[7]  Defendant Smith also claims the affidavit did not accurately describe

the place to be searched because both the address of the residence and the directions to it

were incorrect.  At the hearing he made the additional argument that the officers improperly

commenced the search before the warrant arrived.

## Discussion

Search Warrant--Probable Cause

"Once a ... judge determines probable cause exists, the role of a reviewing court is

merely to ensure the Government's affidavit provided a 'substantial basis' for reaching that

conclusion." United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2009) (quoting Illinois

v. Gates, 462 U.S. 213, 238-39 (1983)).  The court is not to conduct an "'after-the-fact, de

---

[6]*Defendant Smith erroneously asserts Deputy Davis did not specify the date when Undersheriff King called her and when the officers drove by his residence.  However, she did include the date and time the call was made in her affidavit.  Although she did not specify when the officers drove by Smith's residence, it is obvious from the affidavit that the officers had driven by the property and smelled the odor on January 31, 2012, shortly before Undersheriff King called Deputy Davis as the affidavit states that the officers "remained in a pyramid setting of the residence until Search Warrant was obtained."  Search Warrant, Attachment "B."  The information therefore was not stale.*

[7]*Although defendant Smith asserts in the conclusion of his brief that "[a]ny statements made by him and the parties set forth above after the illegal search and the arrest of such individuals were involuntary and not made pursuant to a knowing and intentional waiver of rights under the 5th Amendment," he does not develop this argument.  Therefore the court has deemed it waived and not considered it.*

novo scrutiny' of a [judge]'s probable-cause determination." *Id.* (quoting Massachusetts v. Upton, 466 U.S. 727, 733 (1984)).  The "[judge's] probable cause finding" is accorded "'great deference,'" "[p]rovided the ... judge's 'neutral and detached function' has been properly fulfilled." *Id.* (quoting Gates, 462 U.S. at 236).  As explained by the Tenth Circuit, "probable cause is a 'practical, nontechnical conception,' designed to operate in conjunction with the 'commonsense,' 'practical considerations of everyday life,' rather than the elaborate rules employed by 'legal technicians.'" *Id.* (quoting Gates, 462 U.S. at 230-31).  An actual showing of criminal activity is not required. *Id.*  "Probable cause 'requires only a probability or substantial chance of criminal activity.'" *Id.* (quoting New York v. P.J. Video, Inc., 475 U.S. 868, 877-78 (1986)).  The government's affidavit is interpreted "in a flexible, common-sense way," "[b]ecause probable cause is a 'flexible, common-sense standard.'" *Id.* at 1282 (quoting Gates, 462 U.S. at 239).  "'[D]oubtful or marginal cases'" are resolved "by deferring to a ... judge's determination of probable cause," because of "[t]he Fourth Amendment's strong preference for warrants." *Id.* (quoting Upton, 466 U.S. at 734). "[R]eviewing courts will accept less judicially competent or persuasive evidence of probable cause when the Government conducts its search pursuant to a warrant." *Id.* (internal quotations omitted).

Applying that standard here, "[w]hile the evidence in the [deputy's] affidavit could have been more compelling, [the court] conclude[s] it provided a 'substantial basis' for the [state] judge's determination of probable cause," *id.*, in light of United States v. Windrix, 405 F.3d 1146 (10th Cir. 2005).  There the Tenth Circuit upheld a warrant based on the officers'

detection of "a strong chemical odor ... only associated with the manufacturing of methamphetamine." *Id.* at 1152 (internal quotations omitted).  Noting that the court had "repeatedly held in vehicle-search cases that [a]n officer's detection of the smell of drugs, such as methamphetamine ... can be an independently sufficient basis for probable cause," *id.* (internal quotations omitted), the Tenth Circuit saw "no reason to limit these cases to vehicle searches." *Id.*  It concluded that "the scent of methamphetamine, wherever detected, gives qualified officers probable cause to search for methamphetamine and evidence of methamphetamine manufacturing." *Id.* (emphasis added).  The officer-affiant in Windrix "had been certified by the federal Drug Enforcement Administration in the recognition of methamphetamine odors." *Id.*

The officer reporting the smell in this case, Undersheriff King, had attended both DEA and OBN schools regarding methamphetamine laboratories.  Although it could have been more specific, the search warrant affidavit did state that the undersheriff was able to identify the odor because of his "training [and] experience with methamphetamines lab."  Search Warrant, Attachment "B."  As noted by defendant Smith, the affidavit did not specify the exact source of the odor.  However, it is apparent that the smell was coming from a building on the Smith property and not a field ("drove by described residence in Attachment "A," and detected an very strong odor of Anhydrous Ammonia and Ether").  The affidavit also was not defective for failing to explicitly link the odor to a crime, since the specific chemical odor that is identified is commonly linked to the manufacture of methamphetamine.  While the affidavit submitted to the state judge was certainly bare bones, the court concludes it was

sufficient, in light of the flexible standard referenced above, to support issuance of the warrant.

Alternatively, even if the warrant lacked probable cause, the good faith exception to the exclusionary rule would apply, as the officers could have reasonably relied on the warrant.  The Supreme Court recognized the good faith exception in United States v. Leon, 468 US. 897, 922 (1984).  The Court "'noted four situations in which the exception would not apply because reliance on the warrant by the officers would not be objectively reasonable: (1) if the affidavit for the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' (2) if the issuing magistrate was 'misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;' (3) if the magistrate 'wholly abandoned his judicial role;' and (4) if a warrant is 'so facially deficient ... that the executing officers cannot reasonably presume it to be valid.'"   United States v. Birch, 401 Fed.Appx. 351, 353 (10th Cir. 2010) (unpublished) (quoting Leon, 468 U.S. at 923).  None of those circumstances exists here.

The officers' reliance on the warrant was not "'entirely unreasonable," because the affidavit submitted in its support was not "'devoid of factual support.'"  United States v. Henderson, 595 F.3d 1198, 1201-02 (10th Cir. 2010) (quoting United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985)), cert. denied, ___ U.S. ___ (2010) .  Here, neither Undersheriff King nor the other on-site deputies saw the affidavit before it was prepared and submitted.  What they did know was the nature of the information relayed to Deputy Davis

10

and presumably to the issuing judge, and that information amply supported a probable cause determination. There was no reason for the executing deputies to question the validity of the underlying application.[8]

This is not a situation where probable cause to search did not exist.[9] The odor, which was reported by a neighbor of Smith and confirmed by both Deputy Johnson and Undersheriff King, combined with the undersheriff's training regarding methamphetamine laboratories and his knowledge of Smith and Parker's prior methamphetamine convictions were enough to establish "under the totality of the circumstances" "a 'fair probability' that contraband or other evidence [would] be found in a particular place . . . .'" Biglow, 562 F.3d at 1280-81 (Gates, 462 U.S. at 238).[10]

Although the sufficiency of the affidavit presents a close question, the court

---

[8]*Similarly, given his knowledge of the underlying circumstances and word from Deputy Davis that the warrant had been issued, Undersheriff King's commencement of the search prior to actual on-site receipt of the warrant, while premature, did not establish the absence of good faith.*

[9]*While exigent circumstances can support a warrantless search, the "basic aspects of the exigent circumstances exception" outlined in United States v. Rhiger, 315 F.3d 1283 (10th Cir. 2003) (internal quotations omitted), are not present here. Id. at 1288 (For exigent circumstances to exist, "(1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched." Id. (internal quotations omitted). Undersheriff King testified that he was not concerned about an explosion. Although both the officers and government suggest that, based on the "plain smell doctrine," the officers did not need a warrant to search the property and seize the methamphetamine laboratory, that is incorrect. The residence and outbuildings could not be searched in the absence of exigent circumstances. Rhiger, 315 F.3d at 1287.*

[10]*Additional support for the search was provided by the odor Undersheriff King detected on Parker after he stopped his van and by Parker's response ("shook his head yes,") to the undersheriff's statement that he knew that they had been "cooking dope" at the residence.*

concludes that it established probable cause.  However, if probable cause  was lacking, the

good faith exception to the exclusionary applies.  There is no basis in the record for a finding

that the officers "'[knew] or should have known that [the] search warrant was invalid.'"  *Id.*

at 1202 (quoting United States v. McKneely, 6 F.3d 1447, 1455 (10th Cir. 1993)).  Defendant

has not "overcome the presumption that law enforcement officers acted in objective good

faith when executing [the] warrant to search his [property]."  *Id.*

Property description

        "To determine if a search warrant adequately describes the place to be searched, the

test is (1) whether the description is sufficient to enable the executing officer to locate and

identify the premises with reasonable effort, and (2) whether any reasonable probability

exists that another premises might be mistakenly searched."  United States v. Layman, 244

Fed.Appx. 206, 212 (10th Cir. 2007) (unpublished).  Defendant Smith claims that the

description of the property was fatally deficient. The box number was incorrect, the

directions referred to the town of Hastings, rather than Hooper, and the highway was listed

as being a state, rather than federal, highway.  However, the directions – "beginning at the

intersection of Lone Star Road and State Highway 70, in Hastings, Cotton County,

Oklahoma, go approximately 1 mile east on Highway 70, and you will arrive at the entrance

to the residence located on the north side of the road" – were otherwise accurate.[11]  The

_____

        [11]*Anyone familiar with the area would likely know that Lone Star Road and Highway 70 intersected in the Hooper community/area, not the town of Hastings.  Hooper is located in Cotton County, while Hastings is in Jefferson County.  See Defendant Smith's Hearing Exhibit 1; see also supra note 5. As noted above, the reference to Hastings was apparently based on the postal address.*

description was sufficient to allow the executing officers to locate the property, and a reasonable probability does not exist that another premises might have been searched by mistake.

United States v. Williamson, 1 F.3d 1134 (10th Cir. 1993), relied on by defendant Smith is distinguishable.  The Tenth Circuit concluded in Williamson that the warrant at issue did not "describe the premises to be searched with sufficient particularity because it [could not] be described as even 'practically accurate.'"  *Id.* at 1136.  While the warrant affidavit described the business premises the IRS sought to enter, it was not attached to the warrant itself, which provided no description of the property to be searched. The warrant merely authorized the IRS to enter "'the premises located at Star Route Box 302, Tijeras, New Mexico.'"  *Id.* at 1136.  However, the target of the investigation, Williamson Waterworks, was "located at 1277 Old Highway 66 in Tijeras." *Id.*  Williamson Waterworks consisted of an office and warehouse building, while "Star Route Box 302 identifie[d] a rural mail box located about one mile east and eight miles south of Williamson Waterworks on New Mexico Highway 217." *Id.*

The property to be searched here was specifically described – " a single story white wood frame structure with a White metal roof . . . ." – in an attachment to the warrant.[12] "Furthermore, additional factors supported the warrant's descriptive sufficiency including the executing officers' personal knowledge of the location and the continued presence of officers

---

[12]*The description was in Attachment "A," which was attached to and incorporated in the warrant.*

13

at the location while the search warrant was obtained." <u>Layman</u>, 244 Fed.Appx. at 213. Here, as in <u>Layman</u>, "no reasonable probability existed that another premises might be mistakenly searched in this case because the warrant's terms, when considered in their entirety, could only lead to Defendant's [residence]." *Id.*

Premature Search

As for defendant Smith's remaining argument – that the search began before the warrant arrived – the court concludes that suppression of the evidence seized is not warranted, despite the premature search. "[T]here is no constitutional requirement that an officer present a warrant prior to a search." <u>United States v. Katoa</u>, 379 F.3d 1203, 1205 (10th Cir. 2004). While Fed.R.Crim.P. 41(f)(1)(c) requires the officer who is executing the warrant to give a copy of the warrant to the person whose premises is being searched, "'[v]iolations of Rule 41(d)[13] are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or non-compliance with the rule was intentional or in bad faith.'"[14] <u>United States v. Charles</u>, 883 F.2d 355, 357 (5th Cir. 1989) (quoting <u>United States v. Marx</u>, 635 F.2d 436, 442 (5th Cir.1981)). Here, as in both <u>Charles</u> and <u>Marx</u>, although the search occurred in part (five to ten minutes) without the warrant being physically present, it was after the warrant had been issued. Following the

---

[13]*Rule 41(d) is now Rule 41(f)(1)(C).*

[14]*While Rule 41 is not implicated here because the warrant was issued by a state court judge to a state officer, <u>Katoa</u>, 379 F.3d at1206 n.2, cases discussing the effects of a Rule 41 violation provide guidance in cases such as this, where the search conducted by state officers began after the warrant was issued but before it arrived.*

14

rationale of the Fifth Circuit, the court concludes that suppression is not required, due to the absence of a showing that, because the search commenced shortly before the warrant arrived, "the defendant 'was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed." *Id.* (quoting <u>Marx</u>, 635 F.2d at 441).[15] *See* 2 Wayne R. LaFave, <u>Search and Seizure</u>, § 4.12 (4th ed. 2004) ("The prevailing view in state and federal cases is that such exhibiting or delivering [of search warrants] need be done only prior to post-search departure by the police, so that police advised that a search warrant has issued need not have it with them at the outset.").

Defendants also did not establish what, if any, evidence was seized before the warrant arrived. "To warrant suppression, a defendant must not only show illegal governmental conduct, but a 'nexus'" between the illegality and the challenged evidence." <u>United States v. Coulter</u>, 2012 WL 453642, at *2 (10th Cir. 2012) (unpublished) (quoting <u>United States v. DeLuca</u>, 269 F.3d 1128, 1132 (10th Cir.2001)), *petition for cert. filed,* (U.S. May 14, 2012) (No. 11-10382).

The search of Smith's property was reasonable under the Fourth Amendment. Probable cause was sufficiently indicated by the affidavit for the search warrant and, even if the affidavit be deemed insufficient, the good faith exception applies. The property to be

---

[15]*That is not to say, however, that officers should consider this ruling a green light to proceed with a search whenever a warrant has been issued. While there were extenuating circumstances here, the lateness of the hour, the length of time the officers had been waiting, the fact that two individuals had exited the premises and the fact that the subject of the investigation was a methamphetamine laboratory, the court generally expects officers, in the absence of exigent circumstances, to wait until the warrant arrives before the search begins.*

searched was sufficiently described and the early entry onto the premises before the warrant arrived did not invalidate the search that was conducted. Defendant Smith's motion will be denied and the evidence seized from his  property and any evidence subsequently obtained (derivative evidence) will be permitted at trial, if otherwise admissible.

## Defendant Parker's Motion

Defendant Parker seeks to suppress evidence obtained as a result of the search of the search of Smith's residence, "[a]ll observations made from any of the senses by law enforcement officers" in conjunction with the detention of his vehicle and the search of Smith's residence, and all evidence obtained from search warrants subsequently executed on his cell phone and those of his codefendants and other individuals.[16]  The court assumes he has standing to challenge the search of the Smith property because he was a frequent visitor at the house, where his sister lived with co-defendant Smith, he had keys to the residence, and was a regular overnight guest there.  *See* United States v. Rhiger, 315 F.3d 1283, 1287 (10th Cir. 2003) ( Based on his "regular presence at the home, his overnight stays, the discovery of his receipts in the house, and his comfort in entering the residence unannounced and taking a nap," a social guest's connection to a home was sufficient to establish standing to challenge its search).  However, his challenges to the search of the Smith property essentially duplicate those of his codefendant, Smith.  They therefore fail for the reasons previously given.

_____

[16]*The government argues Parker has no standing to challenge evidence recovered from the cell phones of his codefendants and two other females.  The court does not have to reach that issue because the initial search which led to the cell phone evidence was valid or, if not, the* Leon *exception to the exclusionary rule applies.*

Parker does make the additional argument that there is a house just two-tenths of a mile to the east of Smith's, with a Box 13, address that could fit the description of the residence in the warrant as it faces the same direction as Smith's residence and has farm equipment and vehicles on the premises.  The argument is not persuasive as that house is a different color (grey rather than white), slightly further east and the front door faces a different direction.  *See* defendant's hearing Exhibit 3, Declaration of Adams.  There was not a reasonable probability that the grey house might have been searched by mistake, particularly since the officers had already surrounded the Smith residence.[17]

Defendant Parker's motion to suppress will be denied.

## Defendant Collins' Motion

 Defendant Collins seeks to suppress all evidence, including physical evidence, oral statements and cell phone messages, obtained as a result of the search of Smith's residence and the allegedly illegal stop of his (Collins') truck.  However, Collins does not assert he has standing to challenge the search of the Smith residence and no basis for standing is evident in the record.  He does, though, have standing to challenge the constitutionality of the stop of his pickup.

Collins argues that the officers improperly stopped his vehicle when it exited the

---

[17]*Parker did not develop the argument that his vehicle was unlawfully detained and, therefore, waived it.  Even if the argument was not waived, the officers were entitled to detain his vehicle as they had a reasonable suspicion of criminal activity, which "is considerably less than proof by a preponderance of the evidence or that required for probable cause.*  <u>United States v. Chavez</u>*, 660 F.3d 1215, 1221 (10th Cir. 2011) (internal quotations omitted).*

Smith property.[18]  However, the officers were entitled to detain his vehicle on the basis of the methamphetamine odor coming from Smith's residence, which provided a reasonable suspicion of criminal activity.  *See* United States v. Chavez, 660 F.3d 1215, 1221 (10th Cir. 2011).

As he lacked standing to challenge the search of the Smith property and was not unlawfully detained, Defendant Collins' motion to suppress will be denied.[19]

## Conclusion

Defendants' Fourth Amendment rights were not violated.  The warrant for Smith's residence was supported by probable cause but, if not, the evidence seized is nonetheless admissible under the good faith exception to the exclusionary rule.  The description of the property to be searched was adequate and the commencement of the search before the officers had the warrant in hand does not mandate suppression of any of the evidence that was seized.   Finally, both Parker's and Collins'  vehicles were properly stopped. Accordingly,  defendants' motions to suppress [Doc. Nos. 47, 48, 50] are **DENIED**.

**IT IS SO ORDERED**.

Dated this 30th day of May, 2012. _____

JOE HEATON
UNITED STATES DISTRICT JUDGE

---

[18]*He also claims, without elaboration, that he was illegally arrested.  As that argument apparently hinges on the legality of the stop, it fails.*

[19]*Defendant Collins mentions in his brief  that he was never given any Miranda warnings during the time he was being detained, but does not assert that he was questioned or made any statements that should be suppressed.*